IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| VIRGINIA URANIUM, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No.: 4:15-cv-00031 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| TERRY MCAULIFFE, et al., | ) | By: Hon. Jackson L. Kiser |
| | ) | Senior United States District Judge |
| Defendants. | ) | |

On November 6, 2015, I heard argument on Plaintiffs' Motion for Summary Judgment and Defendants' Rule 12(b)(1) and Rule 12(b)(6) Motions to Dismiss. The parties have fully briefed the motions, and I have reviewed the relevant filings and arguments of counsel. For the reasons stated herein, I will grant Defendants' motions and, accordingly, deny Plaintiffs' motion as moot.

## I.    STATEMENT OF FACTS AND PROCEDURAL BACKGROUND[1]

> Located just to the northeast of Chatham, Virginia, the Coles Hill estate's gently sloped fields have been farmed by the Coles family since shortly after the Revolutionary War. Beneath those fields lies a deposit of approximately 119 million pounds of uranium ore—the largest natural deposit of uranium in the United States and one of the largest in the world.

(Compl. ¶ 24, Aug. 5, 2015 [ECF No. 1].) Plaintiffs Coles Hill, LLC, and Bowen Minerals, LLC, own the land above the Coles Hill uranium deposit. (Id. ¶¶ 10, 11, 25.) While "retaining a royalty interest," they lease the mineral estate to Plaintiff Virginia, Uranium, Inc., which is owned by Plaintiff Virginia Energy Resources, Inc. (Id. ¶¶ 9–12, 25.) The lease is to last until 2045. (Id. ¶¶ 9, 25.)

---

[1] At this stage, the facts are recited in the light most favorable to Plaintiffs, and reasonable inferences are drawn in their favor. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

"Developing the uranium deposit beneath Coles Hill would entail . . . mining, milling, and tailings[2] management." (Id. ¶ 29.) The raw uranium ore would "likely be extracted through a conventional underground mine." (Id. ¶ 30.) This mining would be similar to that for "coal, titanium, and numerous other minerals . . . mined in Virginia." (Id.)

Once extracted from the ground, the uranium ore must be "*milled* or processed into useable form." (Id. ¶ 31.) This processing "[t]ypically" involves an on-site mill. (Id.) The mill would "grind[] the uranium ore into a sand, which [would] then run through either an acidic or alkaline solution to separate pure uranium from . . . 'tailings.'" (Id.) The uranium would, then, be "concentrated and dried into 'yellowcake,' . . . the final product that is commercially sold and shipped off-site for enrichment." (Id.)

The mill tailings "must be securely stored, to prevent any radioactive materials from escaping into the air, leaking into the groundwater, [or] being released to surface waters." (Id. ¶ 34.) At Coles Hill, mill tailings would be stored in a management facility "in safe and reliable below-grade cells, which are capped on top with synthetic and earthen materials to prevent the release of radioactive materials into the air, and lined on the bottom with multiple layers of heavy-duty materials to prevent any release into the surrounding soil or groundwater." (Id. ¶ 32.)

Although Virginia's Department of Mines, Minerals, and Energy has permitted Virginia Uranium, Inc., "to engage in 'exploration activity'" to learn "the nature and extent of the Coles Hills deposit" (id. ¶ 75), Va. Code Ann. § 45.1-283 prevents any Virginia agency from accepting Virginia Uranium's application for a permit to mine it (id. ¶¶ 2, 4, 59, 98–99).[3]

---

[2] Tailings are "the rock left behind when . . . uranium is removed from the raw ore." (Compl. ¶ 32.) These are wastes, a "radioactive byproduct." (See id. ¶ 5.) Wastes might also be left when mining uranium ore from the ground. (See id.)

[3] The Commonwealth of Virginia has agreed to assume some of the Nuclear Regulatory Commission's regulatory authority but none over uranium milling or mill tailings' management. (Compl. ¶ 49.)

On August 5, 2015, Virginia Uranium, Inc., Coles Hill, LLC, Bowen Minerals, LLC, and Virginia Energy Resources, Inc., ("Plaintiffs") filed suit for declaratory and injunctive relief against Virginia's Governor, Secretary of Commerce and Trade, Secretary of Natural Resources, and various officials affiliated with the Department of Environmental Quality ("DEQ") or the Department of Mines, Minerals, and Energy ("Defendants"). Plaintiffs seek a declaration that the Atomic Energy Act of 1954, 42 U.S.C. § 2011 et seq., as amended, ("AEA") preempts Va. Code Ann. § 45.1-283. (Id. ¶ 111.) They also seek an injunction, forbidding Defendants from adhering to Va. Code Ann. § 45.1-283 and requiring them, instead, to process permit applications for uranium mining. (Id.) Defendants move to dismiss, all contending that the AEA does not preempt Va. Code Ann. § 45.1-283. Several Defendants have asserted Eleventh-Amendment immunity as an alternate ground for dismissal.

## II.    STANDARDS OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A "'court need not accept the [plaintiff's] legal conclusions drawn from the facts, nor need it accept as true unwarranted inferences, unreasonable conclusions, or arguments.'" Philips v. Pitt Cnty. Mem'l Hosp., 572 F.3d 176, 180 (4th Cir. 2009) (alteration in original) (quoting Wahi v. Charleston Area Med. Ctr., Inc., 562 F.3d 599, 616 n.26 (4th Cir. 2009)). "When a complaint raises an arguable question of law which the district court ultimately finds is correctly resolved against the plaintiff, dismissal on Rule 12(b)(6) grounds is appropriate . . . ." Neitzke v. Williams, 490 U.S. 319, 328 (1989).

When a state official moves, under Rule 12(b)(1),[4] to dismiss for Eleventh-Amendment immunity and asserts no factual matter beyond the complaint, a court need only determine whether the "complaint fails to allege facts" that would subject the official to suit. See Adams v. Bain, 697 F.2d 1213, 1219 (4th Cir. 1982). "In that event, all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." Id.

## III. DISCUSSION

A. The Governor, the two Cabinet Secretaries, and the DEQ officials are immune from suit.

The Governor, the Secretary of Commerce and Trade, the Secretary of Natural Resources, and the DEQ officials invoke Eleventh-Amendment immunity.

> Under the Eleventh Amendment, "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State." The United States Supreme Court has read the Eleventh Amendment to render States immune from being hauled into federal court by private parties.

Wright v. North Carolina, 787 F.3d 256, 261 (4th Cir. 2015) (alteration in original) (quoting U.S. Const. amend XI).

> [T]he essence of the immunity is that the State cannot be sued in federal court at all, even where the claim has merit, and the importance of immunity as an attribute of the States' sovereignty is such that a court should address that issue promptly once the State asserts its immunity.

Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 482 n.4 (4th Cir. 2005).

---

[4] "Difficult as it may be to describe precisely the nature of Eleventh Amendment immunity," Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 482 (4th Cir. 2005), "'[t]he recent trend . . . appears to treat Eleventh Amendment immunity motions under Rule 12(b)(1),'" Pele v. Pa. Higher Educ. Assistance Agency, 13 F. Supp. 3d 518, 521 (E.D. Va. 2014) (quoting Skaggs v. W. Reg'l Jail, No. CIV. A. 3:13-3293, 2014 WL 66645, at *4 (S.D. W. Va. Jan. 8, 2014)).

A state official's protection is "less robust" than a state's. See Wright, 787 F.3d at 261. "[A] state official ceases to represent the state when it attempts to use state power in violation of the Constitution. Such officials thus may be enjoined from such unconstitutional action . . . but only if they have some connection with the enforcement of an unconstitutional act." Id. (citations and internal quotation marks omitted). This connection, or "special relation," "requires *proximity to* and *responsibility for* the challenged state action." Id. at 261–62 (citations and internal quotation marks omitted). In contrast, "'a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit.'" Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris, 729 F.3d 937, 943 (9th Cir. 2013) (quoting Coal. to Defend Affirmative Action v. Brown, 674 F.3d 1128, 1134 (9th Cir. 2012)), cert. denied, 135 S. Ct. 398 (2014); see Wright, 787 F.3d at 262; Hutto v. S.C. Ret. Sys., 773 F.3d 536, 550 (4th Cir. 2014).

Neither the Governor nor the two Cabinet Secretaries are sufficiently connected to Va. Code Ann. § 45.1-283's implementation to be subject to suit. Plaintiffs allege that these officials generally supervise or set policy for departments involved in Va. Code Ann. § 45.1-283's implementation. (Compl. ¶¶ 13, 14, 18.) These general roles are insufficiently proximate to or responsible for the challenged conduct and do not strip these officials of their Eleventh-Amendment immunity.[5] The Governor and the two Cabinet Secretaries are immune from suit.

The DEQ officials are also insufficiently connected to the challenged conduct. Plaintiffs claim that Va. Code Ann. § 45.1-283 prevents the DEQ officials from issuing four permits

---

[5] Contrary to Plaintiffs' argument, the Governor's policy positions are too far attenuated from Va. Code Ann. § 45.1-283's implementation, see, e.g., Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 330–31 (4th Cir. 2001), and the inquiry does not concern the challenged law's nature, see Ex Parte Young, 209 U.S. 123, 157 (1908). Addressing the two Cabinet Secretaries, Plaintiffs misplace their reliance on Papasan v. Allain, where the Supreme Court merely noted that, owing to his general supervisory authority over local school officials, Mississippi's Secretary of State could be enjoined "[*t*]o the extent that" his conduct "violate[d] the Equal Protection Clause." 478 U.S. 265, 282 n.14 (1985) (emphasis added).

necessary for the proposed mining operation: a Prevention of Significant Deterioration permit, a Major Source of Hazardous Air Pollutants permit, a Virginia Pollutant Discharge Elimination System permit, and a Hazardous Waste Management Facility permit. (Id. ¶¶ 55–58.) Va. Code Ann. § 45.1-283 prohibits "any agency of the Commonwealth" from accepting "permit applications for uranium mining." The four identified permits are not "for uranium mining" but, respectively, for constructing a "major emitting facility," 42 U.S.C. § 7475(a), for constructing and operating a "major source of hazardous air pollutants," 9 Va. Admin. Code § 5-80-1420(A), for discharging "sewage, industrial wastes, other wastes, or any noxious or deleterious substances" into state waters, Va. Code Ann. § 62.1-44.5(A)(1), and for "stor[ing], provid[ing] treatment for, or dispos[ing] of a hazardous waste," id. § 10.1-1426(A). Va. Code Ann. § 45.1-283 might obviate Plaintiffs' application for these permits, but it does not prohibit the DEQ from accepting applications for them. The DEQ officials are immune from suit.

B. The AEA does not preempt Va. Code Ann. § 45.1-283.[6]

"Under the Supremacy Clause, federal statutes are part of 'the supreme law of the land.' A long-standing principle of our jurisprudence teaches that, where there is a clash between state and federal laws, federal law prevails." Sukumar v. Nautilus, Inc., 829 F. Supp. 2d 386, 392 (W.D. Va. 2011) (quoting U.S. Const. art. VI, cl. 2). "Under this principle, Congress has the power to preempt state law." Arizona v. United States, 132 S. Ct. 2492, 2500 (2012). Preemption, however, is not a metaphor for state law being "effortlessly overrun by each and every federal mandate." See Sukumar, 829 F. Supp. 2d at 392. "[C]ourts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest

---

[6] Defendants suggest that discussion in Armstrong v. Exceptional Child Center, Inc., 135 S. Ct. 1378, 1383 (2015), might reveal Plaintiffs to lack a right of action. Distinguishing the Supreme Court's rejection of the notion that the Supremacy Clause implies a private right of action, Plaintiffs correctly rely on its acknowledgment that a party may invoke a federal court's equitable jurisdiction to enjoin preempted conduct. See id. at 1384.

purpose of Congress.'" Arizona, 132 S. Ct. at 2501 (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)).

The primary categories of preemption are "express, field, and conflict." Sukumar, 829 F. Supp. 2d at 392. They "are not 'rigidly distinct,'" Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 n.6 (2000) (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79 n.5 (1990)), and "'the purpose of Congress is the ultimate touchstone in every pre-emption case,'" Epps v. JP Morgan Chase Bank, N.A., 675 F.3d 315, 322 (4th Cir. 2012) (quoting Wyeth v. Levine, 555 U.S. 555, 565 (2009)). Plaintiffs invoke both field and conflict preemption.

1. Va. Code Ann. § 45.1-283 intrudes into no AEA field.

Under field preemption,

> Congress occupies a certain field by regulating so pervasively that there is no room left for the states to supplement federal law, or where there is a federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject.

United States v. South Carolina, 720 F.3d 518, 528–29 (4th Cir. 2013) (omission in original) (citations and internal quotation marks omitted). "'[W]hen the Federal Government completely occupies a given field or an identifiable portion of it, . . . the test of preemption is whether the matter on which the State asserts the right to act is in any way regulated by the Federal Act.'" North Carolina ex rel. Cooper v. Tenn. Valley Auth., 615 F.3d 291, 303–04 (4th Cir. 2010) (omission in original) (quoting Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n, 461 U.S. 190, 212–13 (1983)).

"'Every Act of Congress occupies some field, but [a court] must know the boundaries of that field before [it] can say that [the Act] has precluded a state from the exercise of any power reserved . . . by the Constitution.'" Keller v. City of Fremont, 719 F.3d 931, 942 (8th Cir. 2013) (quoting De Canas v. Bica, 424 U.S. 351, 360 n.8 (1976)), cert. denied, 134 S. Ct. 2140 (2014).

"To determine the boundaries that Congress sought to occupy within the field, '[a court] look[s] to the federal statute itself, read in the light of its constitutional setting and its legislative history.'" Lozano v. City of Hazleton, 724 F.3d 297, 303 (3d Cir. 2013) (quoting De Canas, 424 U.S. at 360 n.8), cert. denied, 134 S. Ct. 1491 (2014). "Statutory text and structure provide the most reliable guideposts in this inquiry." PPL EnergyPlus, LLC v. Nazarian, 753 F.3d 467, 474 (4th Cir. 2014), cert. granted sub nom. CPV Md., LLC v. PPL EnergyPlus, LLC, 136 S. Ct. 356 (2015), and cert. granted sub nom. Hughes v. PPL EnergyPlus, LLC, 136 S. Ct. 382 (2015).

The Atomic Energy Act of 1946, Pub. L. No. 585, ch. 724, 60 Stat. 755, reflected Congress' postwar desire to extend the use of atomic energy to civilian (although still largely governmental) purposes in order to "assur[e] the common defense and security" and "improv[e] the public welfare," among other goals, see id. § 1(a), 60 Stat. at 755–56. It imposed several regulatory fields, including one respecting "source material." Id. § 5(b), 60 Stat. at 761–63. The provisions on source materials were substantially adopted in the Atomic Energy Act of 1954, Pub. L. No. 703, ch. 1073, 68 Stat. 919, which replaced the 1946 legislation. Although there have been significant amendments in the interim, the 1954 legislation is the AEA's foundation.

Since 1954, Congress has premised its regulatory authority over "[t]he processing and utilization" of source materials on its powers respecting "interstate and foreign commerce," "common defense and security," and public "health and safety." 42 U.S.C. § 2012(c), (d); ch. 1073, § 1 (c), (d), 68 Stat. at 921. The 1954 legislation "stemmed from Congress' belief that the national interest would be served if the Government encouraged the private sector to develop atomic energy for peaceful purposes under a program of federal regulation and licensing." English, 496 U.S. at 81. As it did in the 1946 legislation, see generally ch. 724, 60 Stat. at 761–63, Congress gave the Atomic Energy Commission ("AEC") regulatory and licensing authority over (among other things) certain source materials, see generally ch. 1073, 68 Stat. at 932–35.

Today, the Nuclear Regulatory Commission ("NRC") has that authority. 42 U.S.C. § 2141(a);

Energy Reorganization Act of 1974, Pub. L. No. 93-438, 88 Stat. 1233.

As relevant here, the AEA has addressed source materials in much the same manner since

1954 and even since 1946. The AEA defines "source material" to mean

> (1) uranium, thorium, or any other material which is determined by the [NRC] pursuant to the provisions of section 2091 of this title to be source material; or (2) ores containing one or more of the foregoing materials, in such concentration as the [NRC] may by regulation determine from time to time.

42 U.S.C. § 2014(z); see also ch. 1073, § 11(s), 68 Stat. at 924; ch. 724, § 5(b)(1), 60 Stat. at

761. An NRC license is required to

> transfer or receive in interstate commerce, transfer, deliver, receive possession of or title to, or import into or export from the United States any source material *after removal from its place of deposit in nature*, except that licenses shall not be required for quantities of source material which, in the opinion of the [NRC], are unimportant.

42 U.S.C. § 2092 (emphasis added); see also ch. 1073, § 62, 68 Stat. at 932; ch. 724, § 5(b)(2),

60 Stat. at 761. The NRC has authority and discretion to issue

> rules, regulations, or orders requiring reports of ownership, possession, extraction, refining, shipment, or other handling of source material . . . , except that such reports shall not be required with respect to (a) any source material *prior to removal from its place of deposit in nature*, or (b) quantities of source material which in the opinion of the [NRC] are unimportant or the reporting of which will discourage independent prospecting for new deposits.

42 U.S.C. § 2095 (emphasis added); see also ch. 1073, § 65, 68 Stat. at 933; ch. 724, § 5(b)(4),

60 Stat. at 761–62. The AEA confers no federal regulatory or licensing authority over nonfederal

uranium deposits or their conventional mining. It has never done so.

As traditionally understood, the Commonwealth of Virginia is the "paramount

proprietor[]" over its mineral lands. See 1 Curtis H. Lindley, A Treatise on the American Law

Relating to Mines and Mineral Lands §§ 18, 19, at 38–39 (3d ed. 1914) (1988 reprint); cf. Kidd v. Pearson, 128 U.S. 1, 21 (1888) (including "mining" among the "interests which in their nature are, and must be, local in all the details of their successful management").[7] The Virginia General Assembly has enacted schemes by which one must apply to an appropriate state agency for a permit to mine in the Commonwealth. See, e.g., Va. Code Ann. § 45.1-161.57 et seq. (coal); id. § 45.1-161.292:30 et seq. (mineral); id. § 45.1-181.

By emergency legislation of April 7, 1982, the General Assembly forbade any state agency's acceptance of a uranium-mining permit application until July 1, 1983. Act of Apr. 7, 1982, ch. 269, 1982 Va. Acts 426, 428 (codified as amended at Va. Code Ann. § 45.1-283). Enacted findings and policies undergirded the moratorium and related statutes. Notable "purposes" were "to assure," within proper state or local authority, "that uranium mining and milling w[ould] be subject to statutes and regulations which protect the environment and the health and safety of the public." Id. at 427 (codified at Va. Code Ann. § 45.1-272).[8] Notable among the findings was "that the adoption of additional statutes during the 1983 Session . . . may be necessary in order to assure that any uranium mining and milling which may occur in the Commonwealth will not adversely affect the environment or the public health and safety." Id.[9]

During the 1983 session, the General Assembly amended the moratorium statute to the following, which remains unchanged:

> Notwithstanding any other provision of law, permit applications
> for uranium mining shall not be accepted by any agency of the

---

[7] The Commonwealth has accomplished "primacy" under the Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. § 1201 et seq., as amended. 13A Michie's Jurisprudence of Virginia & West Virginia § 74.1, at 126 (Repl. Vol. 2011).

[8] Although not set out in the official Code, these policies and findings remain law. See Editor's Note to Va. Code Ann. § 45.1-272 (Repl. Vol. 2013).

[9] The General Assembly has enacted no statute purporting to regulate uranium milling.

> Commonwealth prior to July 1, 1984, and until a program for
> permitting uranium mining is established by statute. For the
> purpose of construing § 45.1-180 (a), uranium mining shall be
> deemed to have a significant effect on the surface.

Act of Feb. 24, 1983, ch. 3, 1983 Va. Acts 3, 3 (codified at Va. Code Ann. § 45.1-283). No

Virginia statute has established a program for permitting uranium mining.

The AEA institutes no permitting regime respecting nonfederal uranium deposits'

conventional mining and does not otherwise regulate nonfederal uranium deposits or their

conventional mining. Fairly stated, these are the matters on which the Commonwealth, by Va.

Code Ann. § 45.1-283, has asserted the right to act. Va. Code Ann. § 45.1-283 survives the test

of field preemption.

Plaintiffs acknowledge that the AEA does not address a nonfederal uranium deposit's

conventional mining;[10] however, they contend that the General Assembly impermissibly

premised Va. Code Ann. § 45.1-283 on radiological safety concerns—what they identify as the

pertinent regulatory field. Plaintiffs focus the Court on 42 U.S.C. § 2021(k): "Nothing in this

section shall be construed to affect the authority of any state or local agency to regulate activities

for purposes other than protection against radiation hazards." They seem to read this language as

signifying that no state may regulate *any* activity with the intent to protect against radiation

hazards, unless by agreement with the NRC. Although the General Assembly enacted Va. Code

Ann. § 45.1-283 out of concern for uranium (and, therefore, radiological) safety, see ch. 269,

---

[10] Plaintiffs cast the AEA as intentionally omitting conventional mining of nonfederal uranium deposits, given Congress' perception that it posed no serious radiological safety risks and Congress' desire to encourage the development of atomic energy. Plaintiffs cite legislative materials for these propositions, but the cited materials do not go so far as to evince preemptive intent from the omission. See Uranium Mill Tailings Control: Hearings on H.R. 13382, H.R. 12938, H.R. 12535, and H.R. 13049 Before the H. Subcomm. on Energy & the Env't, 95th Cong. 159 (1978) (statement of George Gleason, Exec. Vice President & Gen. Counsel, Am. Nuclear Energy Council); S. Rep. No. 79-1211, at 18 (1946); Atomic Energy: Hearing on H.R. 4280 Before the H. Comm. on Military Affairs, 79th Cong. 125–126 (1945).

1982 Va. Acts at 427 (codified at Va. Code Ann. § 45.1-272), Plaintiffs misread 42 U.S.C. § 2021(k).

Of nearest pertinence to this litigation, 42 U.S.C. § 2021(k)'s encompassing section is meant "to clarify" the states' and the NRC's "respective responsibilities under [the AEA] . . . with respect to the regulation of . . . source . . . materials," 42 U.S.C. § 2021(a)(1), and "to establish procedures and criteria for discontinuance of certain of the [NRC's] regulatory responsibilities with respect to . . . source . . . materials, and the assumption thereof by the States," id. § 2021(a)(4). Under the enacted scheme, the NRC may agree with a state to discontinue certain regulatory authority,[11] which the state will assume, over a source material. Id. § 2021(b)(2). With an agreement, a state will have "authority to regulate the materials covered by the agreement for the protection of the public health and safety from radiation hazards." Id. With or without an agreement, a state has authority to regulate any source material for other purposes. See id. § 2021(k). Read together, these provisions reasonably imply—at most—that, lacking a discontinuance-and-assumption agreement, a state has no authority to protect the public's health and safety from radiation hazards by regulating a source material under the NRC's authority.

These provisions of 42 U.S.C. § 2021 are not original to the AEA but were added by Act of September 23, 1959, Pub. L. No. 86-373, 73 Stat. 688. While considering this legislation, Congress was aware that the AEA did not regulate nonfederal uranium deposits or their conventional mining.[12] Clarifying its intent to take no greater regulatory role over any source (or

---

[11] For example, the NRC may not discontinue, for state assumption, authority over the export or import of source materials into the United States or the disposal of source materials into the ocean or sea. 42 U.S.C. § 2021(c)(2)–(3); see also id. § 2021(c)(4).

[12] The proposition was repeated in pertinent congressional hearings. Federal-State Relationships in the Atomic Energy Field: Hearings Before the J. Comm. on Atomic Energy, 86th Cong. 60 (1959) (statement

other) material, the Joint Committee on Atomic Energy redrafted an earlier version of the eventually-enacted bill "to make it clear that it d[id] not attempt to regulate materials which the AEC d[id] not [then] regulate under the Atomic Energy Act of 1954." S. Rep. No. 86-870 (1959), as reprinted in 1959 U.S.C.C.A.N. 2872, 2875, 2880. The Joint Committee observed that "[s]uch other sources such as x-ray machines and radium also present substantial radiation hazards, but have been for many years the responsibility of the states, the public health service, or other agencies." Id. at 2875. Clearly, the Joint Committee and the enacting Congress intended to similarly respect the states' and other agencies' preexisting authority over nonfederal uranium deposits and their conventional mining.

Congress did not intend 42 U.S.C. § 2021 to broaden the preemptive field respecting source materials so as to include materials outside of the NRC's regulatory authority. The statute's text and history clarify that the NRC's agreement is neither conceived nor necessary for a state to regulate a material or activity traditionally (or otherwise) under its authority and not the

---

of Robert Lowenstein, Office of Gen. Counsel, Atomic Energy Comm'n) ("With respect to mining as such, the [AEC] has taken the position, I believe, in an earlier hearing, and an opinion was furnished by the general counsel, that the [AEC] under the [AEA] does not regulate mining."); id. at 83 (written statement of H.L. Price, Director, Div. of Licensing & Regulation, Atomic Energy Comm'n) ("The [AEC] does not have regulatory jurisdiction over such other sources of radiation as X-ray equipment or radium or over the mining of uranium."); id. at 130 (statement of Lee M. Hydeman, Co-Director, Atomic Energy Research Project, Univ. of Mich. Law Sch.) ("The AEC does not exercise any regulatory control over the mining of uranium ore."); id. at 257 (statement of P. W. Jacoe, Colo. State Dep't of Pub. Health) ("As you know, the [AEC's] regulatory powers regarding radiation hazards apply to the uranium mills and processing plants but not to the mines."); id. at 329 (statement of Rep. Wayne N. Aspinall) (describing "the mining" as "an area where the Federal Government has not assumed and undoubtedly will not assume any jurisdiction"); id. at 340 (statement of John Curran, Dep't of Legis., AFL-CIO) ("While it does issue licenses to mining concerns governing possession and transfer of source materials, the [AEC] exercises no regulatory power over actual mining operations."); id. at 341 (statement of Rep. Chet Holifield) ("The [AEC] exercises no regulatory powers over mining operations. This is true."); see id. at 350 (written statement submitted by John Curran, Dep't of Legis., AFL-CIO) (criticizing the proposed legislation for failing to address "the most important sources of man-made radiation," including "uranium mines" among others, "none of which are presently under the jurisdiction of the [AEC], nor any provision being made that certain of these sources be controlled by State programs as a condition of approval of the Federal-State agreement by the [AEC]"); cf. id. at 447–48 (statement of Leo Goodman, United Auto. Workers) (asserting, to Congressman Holifield's doubt, that the AEC had regulatory authority over uranium mining); id. (letter of Leo Goodman, United Auto. Workers) (following up to offer mining statutes—not the AEA—as authority).

NRC's. The discontinuance-and-assumption scheme does not relate to the authority on which Va. Code Ann. § 45.1-283 rests.

Attempting to identify Va. Code Ann. § 45.1-283's intrusion into a federal field of radiological safety concerns, Plaintiffs invoke various precedents but rely largely on <u>Pacific Gas & Electric Co.</u>, 461 U.S. 190.[13]

A court must heed the cautions that "'[g]eneral expressions, in every opinion, are to be taken in connection with the case in which those expressions are used,'" <u>Ameur v. Gates</u>, 759 F.3d 317, 324 (4th Cir. 2014) (quoting <u>Ark. Game & Fish Comm'n v. United States</u>, 133 S. Ct. 511, 520 (2012)), and that "dicta . . . cannot serve as a source of binding authority in American jurisprudence," <u>United States v. Pasquantino</u>, 336 F.3d 321, 329 (4th Cir. 2003) (en banc), <u>aff'd</u>,

---

[13] Of the decisions Plaintiffs invoke, none answers the question whether the AEA preempts a state's regulation or prohibition of a nonfederal uranium deposit's conventional mining.

Deserving closer scrutiny, Plaintiffs argue by analogy from <u>Skull Valley Band of Goshute Indians v. Nielson</u>, 376 F.3d 1223 (10th Cir. 2004), where the court held that the AEA and the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 et seq., preempted Utah laws on, among other things, roads and municipal services. Plaintiffs identify these road laws and one of the municipal-services laws as addressing matters within the heart of a state's traditional police powers but preempted, nonetheless, for their underlying purposes of radiological safety. The analogy is too loose to guide the analysis here.

The Utah laws targeted a proposed storage facility for spent nuclear fuel, for which a federal license was pending. <u>See id</u> at 1227–28. "[I]n order to prevent the transportation and storage of [spent nuclear fuel] in Utah," the road legislation, Utah Code Ann. §§ 54-4-15, 72-3-301, 72-4-125(4), 78-34-6(5), "jeopardiz[ed] access to the proposed . . . facility" and, by imposing a present and "substantial obstacle to the construction of a[ spent nuclear fuel] facility," "directly and substantially affect[ed] decisions regarding radiological safety levels by those operating nuclear facilities." <u>Skull Valley Band of Goshute Indians</u>, 376 F.3d at 1230, 1251–53. The pertinent municipal-services law, Utah Code Ann. § 17-34-1(3), prohibited any county from "provid[ing], contract[ing] to provide, or agree[ing] in any manner to provide municipal-type services . . . to any area under consideration for a storage facility or transfer facility for the placement of high-level nuclear waste, or greater than class C radioactive waste" and from "seek[ing] to fund services for these facilities by" tax, service charge, or fee. The statute plainly targeted nuclear-waste facilities and only "regulate[d] law enforcement and other similar matters as a means of regulating radiological hazards." <u>Skull Valley Band of Goshute Indians</u>, 376 F.3d at 1248.

In enacting Va. Code Ann. § 45.1-283, the General Assembly did not extend its traditional authority so as to reach activities subject to the NRC's regulation. Utah's legislature, however, specifically targeted its traditional police powers so as to impede and prevent a would-be federal licensee's activities under a potential NRC license. <u>Skull Valley Band of Goshute Indians</u> does not reveal Va. Code Ann. § 45.1-283 to intrude into an AEA field.

- 14 -

544 U.S. 349 (2005). Of special concern here, the Supreme Court's AEA preemption decisions

consider a field respecting the construction or operation of nuclear-power facilities, not source

materials, see English, 496 U.S. 72; Silkwood v. Kerr-McGee Corp., 464 U.S. 238 (1984); Pac.

Gas & Elec. Co., 461 U.S. 190; N. States Power Co. v. Minnesota, 405 U.S. 1035 (1972) (mem.),

aff'g 447 F.2d 1143 (8th Cir. 1971), and the decisions, rendered on full briefing and argument,

differ in dispositive reasoning, compare English, 496 U.S. at 84–85 (holding that a tort arising

from whistleblower retaliation at a nuclear facility was insufficiently related to radiological

safety aspects in the facility's operation), and Silkwood, 464 U.S. at 256 (holding that legislative

history revealed no congressional intent to preempt punitive damages for torts arising from an

employee's radioactive incident at a nuclear powerplant), with Pac. Gas & Elec. Co., 461 U.S. at

216 (holding that a limitation on new nuclear powerplants was economic in nature).

 In Pacific Gas & Electric Co., 461 U.S. at 222, the Supreme Court held that the AEA did

not preempt Cal. Pub. Res. Code § 25524.2, as enacted by Act of June 3, 1976, ch. 196, § 1,

1976 Cal. Stat. 378. As material to the Supreme Court's inquiry, that statute generally provided,

> No nuclear fission thermal powerplant . . . shall be permitted land
> use in the state, or where applicable, be certified by the [State
> Energy Resources and Development Commission] until . . . :
>
>  (a) The commission finds that . . . [the NRC] has approved and
> there exists a demonstrated technology or means for the disposal of
> high-level nuclear waste.
>
>  (b) The commission has reported its findings and the reasons
> therefor . . . to the Legislature. . . . The commission may proceed to
> certify nuclear fission thermal powerplants 100 legislative days
> after reporting its findings unless within [that period] either house
> of the Legislature . . . disaffirm[s] the findings . . . .

Ch. 196, § 1, 1976 Cal. Stat. at 378. Then, as now, the AEA provided that the NRC would

"retain authority and responsibility with respect to regulation of . . . the construction and

operation of any production or utilization facility . . . ," 42 U.S.C. § 2021(c)(1), including a nuclear powerplant subject to Cal. Pub. Res. Code § 25524.2, see id. § 2014(v), (cc).

The power company and supporting amici curiae argued that Cal. Pub. Res. Code § 25524.2 "regulate[d] construction of nuclear plants" and was "allegedly predicated on safety concerns," "ignor[ing] the division between federal and state authority created by the [AEA], and fall[ing] within the field that the Federal Government ha[d] preserved for its own exclusive control." Pac. Gas & Elec. Co., 461 U.S. at 204.

At the outset, the Supreme Court observed that the AEA "does not at any point expressly require the States to construct or authorize nuclear power plants or prohibit the States from deciding, as an absolute or conditional matter, not to permit the construction of any further reactors." Id. at 205. It rejected the power company's argument that the AEA "intended to preserve the Federal Government as the sole regulator of all matters nuclear" and, instead, read the AEA to evince Congress' "inten[t] that the Federal Government should regulate the radiological safety aspects involved in the construction and operation of a nuclear plant, but that the States retain their traditional responsibility in the field of regulating electrical utilities for determining questions of need, reliability, cost and other related state concerns." Id. Compare 42 U.S.C. § 2018, with id. § 2021(c)(1). After further surveying the AEA and its history, the Supreme Court summarized "the dual regulation of nuclear-powered electricity generation: the Federal Government maintains complete control of the safety and 'nuclear' aspects of energy generation; the States exercise their traditional authority over the need for additional generating capacity, the type of generating facilities to be licensed, land use, ratemaking, and the like." Pac. Gas & Elec. Co., 461 U.S. at 211–12. The Supreme Court considered the "more difficult" question to be Cal. Pub. Res. Code § 25524.2's "constru[ction] and classifi[cation]." Id. at 212.

The Supreme Court read Cal. Pub. Res. Code § 25524.2 as "not seek[ing] to regulate the construction or operation of a nuclear powerplant" and added that a statute seeking to do so "would clearly be impermissible . . . even if enacted out of nonsafety concerns" because it would "directly conflict with the NRC's exclusive authority over plant construction and operation." Id. at 212. Rejecting California's "broad[]" argument "that although safety regulation of nuclear plants by States is forbidden, a State may completely prohibit new construction until its safety concerns are satisfied by the Federal Government," the Supreme Court opined that "the Federal Government ha[d] occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States" and added that "[a] State moratorium on nuclear construction grounded in safety concerns falls squarely within the prohibited field." Id. at 212–13. The Supreme Court considered it "necessary to determine" whether Cal. Pub. Res. Code § 25524.2 had "a nonsafety rationale." See id. at 213. Because "the rationale for enacting § 25524.2" was an "economic purpose," the Supreme Court concluded that "the statute l[ay] outside the occupied field of nuclear safety regulation." Id. at 216.

Plaintiffs invoke Pacific Gas & Electric Co. largely for its language, "the Federal Government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States," id. at 212, and arguing by analogy, they connect it to the Supreme Court's suggestion that Cal. Pub. Res. Code § 25524.2 would have been preempted if grounded on radiological safety concerns. In view of the Supreme Court's earlier assertion that the AEA nowhere expressly requires a state to construct or authorize nuclear powerplants, id. at 205, Plaintiffs argue that Va. Code Ann. § 45.1-283, although addressing a matter that the AEA does not, is preempted if the General Assembly enacted it out of concern for radiological safety.

Pacific Gas & Electric Co. is readily distinguishable from the present suit. Cal. Pub. Res. Code § 25524.2 regulated an activity that the AEA clearly committed to the NRC's regulatory

authority—the construction of a nuclear powerplant. See 42 U.S.C. § 2021(c)(1).[14] Because Cal. Pub. Res. Code § 25524.2 reached into a field under the NRC's regulatory authority, as expressly provided for by the AEA, it was necessary to determine the California statute's purpose. See id. § 2021(k). Here, the AEA is silent and confers no authority to the NRC respecting the activity or material on which the Commonwealth has asserted the right to act. Accordingly, there is no occasion to inquire into Va. Code Ann. § 45.1-283's purpose.

Even setting that distinction aside, by suggesting that Cal. Pub. Res. Code § 25524.2 would have been preempted if grounded in radiological safety concerns, the Supreme Court opined on a hypothetical statute not before it. This was dictum. See id. at 223–24 (Blackmun, J., concurring in part and concurring in judgment) ("Since the Court finds that California was not so motivated, this suggestion is unnecessary to the Court's holding.");[15] cf. English, 496 U.S. at 84 n.7 (acknowledging the Pacific Gas & Electric Co. concurrence's observation but reserving decision whether the majority's suggestion was dictum). Rather than be betrayed into such an abstract analysis as extrapolating Pacific Gas & Electric Co.'s dicta and selecting among the opinion's (at times) seemingly-inconsistent language,[16] this Court will adhere to the surer

---

[14] The Supreme Court's language seems at odds. After asserting that Cal. Pub. Res. Code § 25524.2 did not seek to regulate nuclear-powerplant construction, Pac. Gas & Elec. Co., 461 U.S. at 212, the Supreme Court justified its inquiry into nonsafety rationale by characterizing the statute as "[a] state moratorium on nuclear construction . . ." and "[a] state prohibition on nuclear construction . . . ," id. at 213. Regardless whether the Supreme Court, in a select phrase, considered such a state moratorium or prohibition on nuclear-powerplant construction *not* to be a "regulation" of nuclear-powerplant construction, the competing language and pertinent statutes clarify how the Supreme Court reached the inquiry into statutory purpose and why that inquiry is immaterial here. Cf. 42 U.S.C. § 2021(c)(1); Black's Law Dictionary (10th ed. 2014) (defining "regulation" as "[c]ontrol over something by rule or restriction").

[15] Although the Supreme Court asserted that the inquiry into nonsafety rationale was "necessary," Pac. Gas & Elec. Co., 461 U.S. at 213, such an assertion "cannot transmute dictum into decision," see United States v. Rubin, 609 F.2d 51, 69 (2d Cir. 1979) (Friendly, J., concurring).

[16] It is notable, for instance, that the majority opinion "recognizes the limited nature of the federal role but then describes that role in more expansive terms." Pacific Gas & Elec. Co., 461 U.S. at 224 n.1 (Blackmun, J., concurring in part and concurring in judgment) (citations omitted); see also supra note 14.

conclusion by scrutinizing the statutes uniquely before it and addressing their interaction under intelligible and longstanding principles of preemption.

Plaintiffs also fail to cast Va. Code Ann. § 45.1-283 as intruding into the AEA's regulatory fields respecting byproduct materials, milling, or mill tailings' management. Va. Code Ann. § 45.1-283 directly prohibits a Virginia agency's acceptance of a permit application to mine uranium and, proximately, prevents conventional mining of nonfederal uranium deposits. The AEA regulates none of these activities or materials.[17] The inability to conventionally mine a nonfederal uranium deposit might obviate one's decision to mill and manage the mill tailings on an active uranium-mining site; however, such a consequence is too far attenuated from the matter on which the General Assembly has asserted the right to act and on which Congress, by the AEA, has not.

    2.   Va. Code Ann. § 45.1-283 does not obstruct the realization of Congress' purposes and objectives behind the AEA.[18]

"Obstacle preemption is a type of conflict preemption . . . . It applies 'where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" <u>Columbia Venture, LLC v. Dewberry & Davis, LLC</u>, 604 F.3d 824, 829 (4th Cir. 2010) (quoting <u>Freightliner Corp. v. Myrick</u>, 514 U.S. 280, 287 (1995)).

> What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects. A state law may pose an obstacle to federal purposes by interfering with the accomplishment of Congress's actual objectives, or by interfering

---

[17] The definition of "byproduct materials" includes neither a nonfederal uranium deposit nor any wastes from such a deposit's conventional mining. <u>See</u> 42 U.S.C. § 2014(e). Nor are those materials within definitions, for purposes of mill tailings' radiation control, of "residual radioactive material" or "tailings." <u>See</u> <u>id.</u> § 7911(7), (8).

[18] To whatever extent Plaintiffs claim conflict preemption's impossibility subset (<u>see</u> Compl. ¶ 110), it similarly fails. It is not the case that the AEA requires Plaintiffs to do one thing and Va. Code Ann. § 45.1-283, the opposite.

with the methods that Congress selected for meeting those legislative goals.

PPL EnergyPlus, LLC, 753 F.3d at 478 (citations and internal quotation marks omitted). "In making this determination, a court 'should not seek out conflicts . . . where none clearly exists.'" H & R Block E. Enters., Inc. v. Raskin, 591 F.3d 718, 723 (4th Cir. 2010) (omission in original) (quoting College Loan Corp. v. SLM Corp., 396 F.3d 588, 598 (4th Cir. 2005)); see also English, 496 U.S. at 90.

Plaintiffs contend that Va. Code Ann. § 45.1-283 conflicts with "a primary purpose of the [AEA] . . . the promotion of nuclear power." Pac. Gas & Elec. Co., 461 U.S. at 221. They also assert that, by obviating potential on-site milling and mill-tailings management, Va. Code Ann. § 45.1-283 conflicts with Congress' judgment that those activities may proceed.[19] Congress has broadly stated a policy promoting atomic energy, see 42 U.S.C. § 2011, but it has evinced no purpose or objective that nonfederal uranium deposits be conventionally mined.[20] Congress has provided for the regulation of milling and mill tailings, see id. §§ 2014(e)(2), 2111–14; id. § 7901 et seq., but it has evinced no purpose or objective that nonfederal uranium deposits should be conventionally mined for milling's and mill-tailings management's on-site accompaniment. Va. Code Ann. § 45.1-283 does not, in any meaningful way, obstruct the realization of Congress' purposes and objectives behind the AEA.

## CONCLUSION

The Governor, the two Cabinet Secretaries, and the DEQ officials are insufficiently connected to Va. Code Ann. § 45.1-283's implementation and, accordingly, are immune from

---

[19] Plaintiffs also contend that Va. Code Ann. § 45.1-283 reflects an attempt to avoid the AEA's discontinuance-and-assumption scheme. As explained, that scheme does not relate to the authority on which Va. Code Ann. § 45.1-283 rests. See supra pgs. 12–14.

[20] Should the NRC wish that a nonfederal uranium deposit be conventionally mined, it has unobstructed means for seeing that it occur. See 42 U.S.C. § 2096.

suit. I will grant their Rule 12(b)(1) Motion to Dismiss. Because the AEA does not preempt Va. Code Ann. § 45.1-283, I will grant Defendants' Rule 12(b)(6) Motion to Dismiss. These dispositions moot Plaintiffs' Motion for Summary Judgment, and it will be denied as such.

The clerk is directed to forward a copy of this Memorandum Opinion and accompanying Order to all counsel of record.

Entered this 2nd day of December, 2015.


s/Jackson L. Kiser
SENIOR UNITED STATES DISTRICT JUDGE